Filed 3/8/19; pub. order 4/5/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KENNETH K. YORK et al., | B278254 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS153326) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, and James C. Chalfant, Judges.  Affirmed.

Ervin Cohen & Jessup and Allan B. Cooper for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Terry P. Kaufmann Macias, Assistant City Attorney, Charles D. Sewell and Jennifer K. Tobkin, Deputy City Attorneys for Defendants and Respondents.

Kenneth and Annette York (plaintiffs) own a 40-acre parcel of land in the Hollywood Hills. In 2011, they sought approval from the City of Los Angeles (City) to build a large house, guest house, and recreational area on the property. To do so, they also sought approval of nearly 80,000 cubic yards of grading—more than 24 times the amount of grading permitted by right. The City granted permission to build the home and most of the accessory structures, but denied the grading request. Plaintiffs then filed a complaint in the superior court that sought a writ of mandate and alleged causes of action for inverse condemnation and violation of civil rights. The superior court denied the mandate petition and granted judgment on the pleadings on the inverse condemnation and civil rights causes of action. Plaintiffs appealed.

On appeal, plaintiffs characterize the City's action as a final decision limiting them to 3,300 cubic yards of grading—a grading limitation that plaintiffs contend will foreclose any development of the property. The record does not bear out these characterizations. While the City denied plaintiffs' request for almost 80,000 cubic yards of grading, it neither definitively limited plaintiffs to 3,300 cubic yards nor precluded plaintiffs from submitting another, more modest, development proposal. Moreover, nothing to which plaintiffs have directed our attention supports plaintiffs' contention that building a home of *any* size on the property will require all, or nearly all, of the grading requested. Accordingly, we find no error in the trial court's determinations, and thus we affirm the judgment in its entirety.

**FACTUAL AND PROCEDURAL HISTORY**

A. *Plaintiffs' Development Proposal*

Plaintiffs own a 40-acre parcel located at 6459 Innsdale Drive, Los Angeles (the property), as well as a smaller adjacent parcel on which they have lived for many years. The property is bordered on three sides by publicly-owned land: Griffith Park to the north and east, and the Department of Water and Power to the west. The property currently is undeveloped with the exception of a vineyard, orchards, and vegetable gardens. It is zoned RE-40-1-H (residential estate—minimum lot size 40,000 square feet).

On November 15, 2011, plaintiffs applied to the Los Angeles Planning Department for approval to build an 8,000 square foot home, a 1,300 square foot guest house, a driveway, swimming pool, tennis court, storage sheds, retaining walls, and "wine caves" on the property. In connection with the proposed project, plaintiffs requested approval for 79,700 cubic yards of grading: 39,850 cubic yards of cut (excavated earth materials) and 39,850 cubic yards of fill (deposit of excavated materials on-site).

B. *The Baseline Hillside Ordinance*

The Baseline Hillside Ordinance (BHO), which is codified at Los Angeles Municipal Code (LAMC)[1] section 12.21(C)(10), sets out the maximum amount of grading allowable on a property in a designated hillside area. At all times relevant to this appeal, the maximum grading permitted by the BHO on the property as

---

[1]    All subsequent undesignated section references are to the LAMC.

3

a matter of right was 3,300 cubic yards. (Former § 12.21(C)(10)(f)(1).)[2]

A party may obtain relief from the BHO's grading limitations by applying to the Planning Department for a deviation. A zoning administrator may grant a deviation from "by-right" grading limitations to allow additional grading up to an amount no greater than 500 cubic yards plus five percent of the total lot size. (Former § 12.21(C)(10)(f)(4)(i).) It is undisputed that plaintiffs' property is approximately 40 acres, or 1,742,400 square feet, and thus that the zoning administrator had discretion to grant up to 87,620 cubic yards of grading.

In order to grant a deviation from the by-right grading limitations, a zoning administrator must hold a public hearing and make the following findings required by section 12.24(E):

"(1) . . . the project will enhance the built environment in the surrounding neighborhood or will perform a function or provide a service that is essential or beneficial to the community, city, or region;

"(2) . . . the project's location, size, height, operations and other significant features will be compatible with and will not adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, and safety; and

"(3) . . . the project substantially conforms with the purpose, intent and provisions of the General Plan, the applicable community plan, and any applicable specific plan."

---

[2]     In March 2017, section 12.21(C)(10)(f)(1) was amended to allow maximum grading of 1,000 cubic yards, plus 10 percent of the lot size, not to exceed 6,600 cubic yards.

The zoning administrator must also make the following additional findings required by section 12.24(X)(28)(b)(2):

"[A]pproval . . . is in conformity with the public necessity, convenience, general welfare and good zoning practice[;] . . . the action will be in substantial conformance with the various elements and objectives of the General Plan[;] . . . [¶] . . . [¶] . . . the increase in the maximum quantity of earth import or export will not lead to the significant alteration of the existing natural terrain[;] . . . the hauling of earth is being done in a manner that does not significantly affect the existing conditions of the Street improvements and traffic of the Streets along the haul route[;] and . . . potentially significant impacts to the public health, safety, and welfare of the surrounding community are being mitigated to the fullest extent feasible."

C.      *The Zoning Administrator's Determination*

On November 19, 2013, Associate Zoning Administrator Charles Rausch (the zoning administrator) conducted a public hearing on plaintiffs' proposed project. Approximately 30 to 40 local residents attended the hearing, the majority of whom opposed the project.

On about August 8, 2014, the zoning administrator issued a written determination approving the construction of the requested single-family home and most of the accessory buildings and retaining walls. However, the zoning administrator denied the request for 79,700 cubic yards of grading. In connection with the denial, the zoning administrator made a number of specific findings, including the following:

*The project will not enhance the built environment in the surrounding neighborhood or will not perform a function or provide a service that is essential or beneficial to the community,*

5

*city, or region (§ 12.24(E)(1))*: "One of the intents of the [BHO] was to control the mass of individual single-family homes in hillside areas of the city. Along with controls on the size of homes, an important section of the ordinance controlled grading which would occur on individual lots. The intent of the grading restrictions was to control the amount of flat areas on lots that could be graded in order to include private recreational facilities such as swimming pools, tennis courts, lawn areas and guest houses. The construction of such uses often resulted in excessive grading as well as the construction of retaining walls of excessive heights in order to manufacture flat areas on hillsides which could accommodate such uses.

"The plan for the subject property included an extensive auxiliary 12-foot wide driveway which extended from the main 20-foot wide driveway to the proposed house up the hillside to a proposed tennis court. The driveway itself would cause extensive grading in order to flatten the slope to the maximum of a 15% grade required by the Fire Department for emergency vehicle access. It would also require extensive grading of the easterly and westerly slopes adjacent to the tennis court. It was explained at the hearing that this extensive grading of up to 79,700 cubic yards of earth was needed in order to balance all of the graded material on the site and avoid the need to haul dirt off the site on the often narrow streets which surround the site.

"The Zoning Administrator has decided to deny the requested 79,700 cubic yards of grading and instead permit the maximum of 3,300 cubic yards of grading permitted by Section 12.21(C)(10)(f) of the Municipal Code for an RE40 lot which is approximately 40 acres in size. . . . [O]ne of the intents of the Hillside Standards Ordinance was to control the amount of

6

grading in hillside areas which often marred the views of the scenic hillsides of the Santa Monica Mountains in the Los Angeles region. Normally a 40-acre parcel of land is large enough to accommodate grading because the ridges and valleys which cross such large lots conceal the grading and other development of the site. In this particular case, the property sits on a prominent ridge leading up the side of Cahuenga Peak and Mount Lee under the iconic Hollywood Sign which is prominent to the east of the site. The property is famous for a large vineyard which has been planted on it and is prominently visible from the flats of Hollywood and very prominent in sight lines up the hill from the Hollywood (U.S. 101) Freeway. The addition of a large graded area on the westerly end of this prominent property would be seen from large areas of the Central Los Angeles Basin. In addition, the property is also very prominent to those on the popular walking trail which the City maintains around Lake Hollywood—especially from Mulholland Dam at the foot of the lake. Though view protection is normally not a concern in Individual Community Plan areas, the Hollywood Community Plan's objectives include Objective 3a[,] 'In Hillside residential areas to minimize grading so as to retain the natural terrain and ecological balance' and Objective 7[,] 'To encourage the preservation of open space consistent with property rights when privately owned and to promote the preservation of views, natural character and topography of mountainous parts of the Community for the enjoyment of both local residents and persons throughout the Los Angeles region.' . . . The prominence of the site as well as the grading of the site well in excess of that permitted by the Zoning Code is contrary to these objectives of the Hollywood Community Plan."

7

*The project's size, height, operations and other significant features will not be compatible with or will adversely affect or further degrade adjacent properties, the surrounding neighborhood, or the public health, welfare, or safety (§ 12.24(E)(2))*:  "The request to grade 79,700 cubic yards of dirt on the site would not be compatible with adjacent properties or the surrounding neighborhood.  Surrounding lots on Innsdale Drive range in size from a quarter to one half acre in size.  The subject RE40 lot is to the north of Innsdale Drive and is 40+ acres in size.  The current development on Innsdale Drive is well concealed from view from adjacent areas by ridgelines and the low height of the structures so they do not dominate views from surrounding areas.  The subject development will result in a graded road extending up a hillside to a private recreation area . . . .  Though the Code requires these graded slopes to be landscaped to cover the grading scars in the hillside, the cut slopes will still have an extensive system of concrete or riprap interceptor channels which will cross the graded slope to channel Stormwater runoff into a drain at the bottom of the slopes.  This water will be directed down the undeveloped slopes to the west of the site which ultimately drain into Lake Hollywood or any intervening storm drains."

*The project does not substantially conform with the purpose, intent and provisions of the General Plan, the applicable neighborhood Community Plan and any applicable specific plan (§ 12.24(E)(3))*:  "The Hollywood Community Plan includes the following objective in the Plan text:  Objective 3a[,] 'In hillside residential areas to . . . [m]inimize grading so as to retain the natural terrain and ecological balance'; and Objective 7[,] 'To encourage the preservation of open space consistent with

8

property rights when privately owned and to promote the preservation of views, natural character and topography of mountainous parts of the Community for the enjoyment of both local residents and persons throughout the Los Angeles region.' The proposed grading of 79,700 cubic yards of dirt on the site will occur on a prominent ridge which is viewable from not only Hollywood proper below the site but from throughout the Los Angeles Basin in areas with a view of the Hollywood Sign.

"The prominence of the site requires care in the development of it. The existing vineyard is already prominent in views. The proposed grading includes moving soil to grade a long access road directly up a ridge line in order to access a tennis court which is built into a hillside requiring grading both above and below the court. Both will be prominent in sight lines from below and to the sides of the property. The grading in this area is not for the purpose of building the home and is contrary to the intent of both Objective 3a and the Hillside Ordinance's limitation on grading on hillside lots which was to permit grading for the home-site but not for extraneous recreation areas beyond the stated limits of the ordinance. It was stated at the hearing that the excess grading was requested so that the grading for the home-site could be balanced on-site. While this is a worthwhile goal in areas with narrow streets such as those accessing the site from the south via Beachwood Canyon, the access from the west from Barham Boulevard is over Lake Hollywood Drive which is a standard hillside street with parking on both sides of the street and two travel lanes. In the vicinity of Lake Hollywood, Lake Hollywood Drive is free of parking except when accessing the Lake where parking is permitted for hikers accessing the lakeside walk. The excess grading is not justified in order to

9

avoid a haul route when adequate streets for the hauling of graded material are available."

*The requested grading in excess of the 3,300 cubic yards permitted by the Municipal Code is not in conformity with the public necessity, convenience, general welfare and good zoning practice and the request will not be in substantial conformance with the various elements and objectives of the General Plan (§ 12.24(X)(28) (b))*: "The request for 79,700 cubic yards of grading on the site provides no public necessity . . . . It was explained at the hearing that the excess grading was requested in order to avoid the need to haul graded material off of the site. The requested residence, however, is located and has access to standard hillside streets leading down to Barham Boulevard westerly of the site. Though balancing the graded material on the site and avoiding dump trucks hauling material through mountain roads may appear to be a public good, the excessive grading required to balance the graded material on-site is excessive and creates its own air pollution problems. The excessive grading would not be in conformance with good zoning practice as the Zoning Code was amended in 2011 by the Hillside Development Standards Ordinance to limit excessive grading on hillsides and to further limit grading and retaining walls which would be used to create flat areas for further private recreation areas in the City's hillside areas. . . . The existing vineyard of the property owner is already prominent in the viewshed of the [Hollywood] Sign. The addition of the graded road, retaining walls, graded slopes with Stormwater runoff channels would be an additional private improvement, and in this case an unnecessary one, to the public view."

10

D. *Administrative Appeal to the Area Planning Commission*

The Municipal Code provides that a zoning administrator's decision and findings are appealable to an Area Planning Commission, which is required to hold a public hearing. (§§ 12.21(A)(2), 12.24(C) & (I)(3).)  In reviewing the zoning administrator's decision, the APC "shall make its decision, based on the record, as to whether the initial decision-maker erred or abused his or her discretion."  (§ 12.24(I)(3).)

On about August 20, 2014, plaintiffs appealed the zoning administrator's determination to the Planning Department's Central Area Planning Commission (APC).  The APC held a public hearing on the appeal on October 28, 2014.

At the hearing, the zoning administrator testified, among other things, that when he issued his decision, he misunderstood the scope of his discretion under the LAMC. However, he said, even had he correctly understood the scope of his discretion, he would have made the same decision.  He explained that plaintiffs' proposal called for keeping the fill on-site, which would require a secondary 12-foot-wide road to transport the fill to a new location. The proposed road was on a prominent ridgeline that was visible from the public land surrounding Lake Hollywood, Mulholland Dam, and the flats of Hollywood.  The zoning administrator did not believe the ridge should be marred to avoid having to remove fill from the property, noting that the proposed road "may be a permanent instead of a temporary discomfort."  The zoning administrator further explained that he had not approved grading in an amount between 3,300 cubic yards and 79,000 cubic yards because "all I had before me was 79,000 cubic yards.  I did not have any alternatives to this particular project."

11

Plaintiffs' attorney told the APC that her clients had made several changes to their proposal by eliminating the proposed tennis court and sheds. Notwithstanding these changes, plaintiffs did not reduce their grading request. To the contrary, their counsel stated that the fire road and house pad required approximately 35,000 cubic yards of cut (21,262 cubic yards for the fire road and 14,277 cubic yards for the house pad), and plaintiffs wished to keep all the grading material on site, which would require an additional 42,239 cubic yards of grading (3,444 cubic yards for the fill road and 38,795 cubic yards for the fill site).

After further discussion, the Commissioners voted to deny the appeal and sustain the decision of the zoning administrator.

E. *Trial Court Proceedings*

1. <u>Complaint and Petition</u>

Plaintiffs filed a complaint and petition for writ of mandate in January 2015. The first cause of action alleged that the City's action was arbitrary and capricious, and it sought a writ of mandate directing the City to set aside its action and approve the application "in a manner that will permit the construction of a single-family home on the Property in a feasible and timely fashion." The second cause of action, for inverse condemnation, alleged that the City had taken plaintiffs' property by depriving them of substantially all economically viable or beneficial uses of the Property. The third cause of action, for violation of civil rights, alleged that the City had arbitrarily and unlawfully imposed restrictions on plaintiffs' use of their property and treated plaintiffs differently than other similarly-situated homeowners.

12

## 2. Mandate Proceedings

Following proceedings before the trial court, the court denied plaintiffs' mandate petition, concluding that the City's findings and decision were supported by substantial evidence. Among other things, the trial court found that substantial evidence supported the City's finding that the project was inconsistent with Hollywood's Community Plan; plaintiffs never reduced their grading request below 78,500 cubic yards;[3] the APC's decision did not "prevent[] the construction of any home on the Property;" plaintiffs received a "fair and impartial hearing;" and the City was "not required to explain to the Yorks what amount of grading they could perform for any project they might build on the Property; the findings only had to explain why the request for 78,500 cubic yards of grading was denied."

## 3. Judgment on the Pleadings

The City subsequently moved for judgment on the pleadings, urging that plaintiffs' inverse condemnation and civil rights claims were not ripe because the City had denied a single grading request, but had not made a final determination limiting any potential grading on the property to 3,300 cubic yards. The City urged that the extent of grading it would approve on the property was uncertain because plaintiffs never presented the City with an alternative grading proposal or asked the City to consider any proposal for less than 79,700 cubic yards. In support, the City sought judicial notice of various portions of the

---

[3] The trial court's findings variously refer to plaintiffs' grading request as for 78,500 and 79,700 cubic yards of cut and fill. The discrepancy is not material for our purposes.

13

LAMC, the APC's determination letter, and the zoning administrator's determination and findings.

The court granted the request for judicial notice and the motion for judgment on the pleadings, concluding, among other things, that "the matter [is] not ripe as plaintiffs have not proposed plans of reduced scope that would nonetheless allow the proposed project. Plaintiffs, for instance, could propose plans that would export all or some of the excavated soil from the site or propose its deposit elsewhere on the site."

The trial court entered judgment on August 16, 2016. Plaintiffs timely appealed.

## DISCUSSION

Plaintiffs challenge both the denial of the petition for writ of administrative mandate and the grant of judgment on the pleadings. As we now discuss, we find no error, and thus we affirm.[4]

---

[4] In their opening brief, plaintiffs assert that they will not repeat the arguments they made in the trial court because the "[t]he documents in the record contain in detail the arguments Appellants made below and the factual and legal basis for each argument." To the extent plaintiffs purport to incorporate by reference the arguments they made below but have not included in their appellate briefs, we decline to consider them because "[i]t is well settled that the Court of Appeal does not permit incorporation by reference of documents filed in the trial court. (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1301, fn. 2 ['[I]t is not appropriate to incorporate by reference, into a brief, points and authorities contained in trial court papers, even if such papers are made a part of the appellate record']; *Estate of Wiedemann* (1964) 228 Cal.App.2d 362, 370–371 [incorporation by reference of points and authorities filed in the trial court

14

# I.

## The Trial Court Did Not Err in Denying the Petition for Writ of Mandate

### A.     *Standard of Review*

Under Code of Civil Procedure section 1094.5, administrative mandamus is available for review of "any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer."

" 'In reviewing an agency's decision under Code of Civil Procedure section 1094.5, the trial court determines whether (1) the agency proceeded without, or in excess of, jurisdiction; (2) there was a fair hearing; and (3) the agency abused its discretion.  [Citation.]'  [Citations.]  'Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'  (§ 1094.5, subd. (b).)  'The trial court and appellate court apply the same standard; the trial court's determination is not binding on us.  [Citation.]'  [Citation.]" (*West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1517–1518.)

violates Cal. Rules of Court . . .].)"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 295, fn. 20.)

B. *The City Did Not Abuse Its Discretion by Denying Plaintiffs' Request for a Deviation from the BHO's Grading Requirements*

Plaintiffs contend that the City abused its discretion by denying their request for relief from the BHO's grading requirements. Specifically, plaintiffs urge the denial (1) was based on the zoning administrator's erroneous understanding of the scope of his discretion, (2) precludes any development of the parcel, and (3) was unsupported by the evidence. For the reasons that follow, these contentions are without merit.

1. The Zoning Administrator's Alleged Misunderstanding of the Scope of His Discretion Was Not Prejudicially Erroneous

Plaintiffs contend that the City's determination must be reversed because the zoning administrator mistakenly believed he had only two choices before him—to grant or to deny plaintiffs' grading request in its entirety—and thus he never exercised his discretion to grant plaintiffs' request *in part*.[5] Plaintiffs urge that on this record, the APC should have reversed the zoning administrator's determination and ordered him "to re-hear the matter and exercise discretion." Because the APC did not do so, plaintiffs suggest, the trial court should have granted the writ

---

[5] As the City correctly notes, the subject of a petition for writ of administrative mandate is a *final* decision by the City—in this case the decision of the APC. (Code Civ. Proc., § 1094.5 [writ may issue for the purpose of inquiring into the validity of "any *final* administrative order or decision"].) Nonetheless, an abuse of discretion by the zoning administrator could be relevant to our review if such abuse should have compelled the APC to reverse the decision of the zoning administrator.

and returned the matter to the City for further fact-finding and decision.

There are many problems with plaintiffs' contention, among them that an abuse of discretion results in reversible error only if it is *prejudicial.* (E.g., *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527 [an abuse of discretion results in reversible error only when it results in the denial of a fair hearing or otherwise prejudices a party]; *Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 428 [abuse of discretion does not require reversal unless the appellant shows the ruling was prejudicial—i.e., that it is reasonably probable the appellant would have obtained a more favorable result absent the error].) In the present case, while the zoning administrator acknowledged that he had misunderstood the scope of his discretion at the time he prepared his report, he told the APC he would have made the same decision in any case. He explained: "I must make a statement that I made a mistake in my reading of the Code . . . . [¶] Nonetheless, in admitting the error, *I would have still come to the same conclusion.*" (Italics added.) Because the asserted abuse of discretion did not affect the decision, it was not prejudicial.

2. <u>The City Did Not Preclude Plaintiffs from Building a Home on the Property</u>

Plaintiffs contend that the City's outright denial of their request for a deviation was an abuse of discretion because it precludes them from building a home of any size on the property. In support, plaintiffs suggest that the evidence was "undisputed" that the proposed home "was located at the least intrusive location on the Property" and that to build "*any* home on the Property would require . . . more than 35,000 cubic yards of

17

'cut,' " or more than 71,000 cubic yards of total ("balanced") grading—28,554 cubic yards for a house pad and 42,524 cubic yards for a fire road.[6] But the portions of the record on which plaintiffs rely do not support this contention—either by undisputed evidence or otherwise. Most of plaintiffs' citations are to the assertions of their attorneys, which are *argument*, not evidence. (See *South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 668, fn. 14 ["We give no weight to counsel's statements, as arguments by counsel are not evidence"]; *Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 139 ["Statements and arguments by counsel are not evidence"].) The remaining citations are to maps and aerial photographs that depict the parameters of plaintiffs' proposed project, but in no way demonstrate that any *alternative* project would require as much, or more, grading. We therefore agree with the trial court's assessment: "There's no evidence that [plaintiffs] cannot build a home on this property other th[a]n with the 78,500 cubic yards of cut of fill. There's no evidence of that."[7]

---

[6] In a "balanced grading" plan, earth excavated from one section of the property is deposited elsewhere on the property.

[7] At oral argument, plaintiffs' counsel urged the court to consider a declaration submitted by plaintiffs' civil engineer, Stephen Smith, as evidence that no house could be built on the property with less grading than plaintiffs requested. We decline to consider it. The declaration was submitted for the first time in opposition to the City's motion for judgment on the pleadings, and thus it was not before either of the City's decision makers (the zoning administrator or APC) or the trial court reviewing the petition for writ of mandate. It therefore is not properly before us in connection with our review of the trial court's order denying the mandate petition.

Plaintiffs appear to suggest that the City was required to approve their project in the absence of evidence that the amount of grading required to build a house on the property could be reduced by building a smaller house or placing it elsewhere on the property. But as the trial court correctly noted, the reason there is no evidence concerning the necessary grading for a smaller home, a different home location, or a different driveway, is that *plaintiffs* failed to present it. Stated simply, the City had no duty to present evidence concerning the amount of grading necessary to build a home on plaintiffs' property, and neither the zoning administrator nor the APC had a duty to consider any project other than the one plaintiffs presented to them. Instead, as the applicants for the land use adjustment, plaintiffs bore the burden of demonstrating their entitlement to the adjustment. (See *Hauser v. Ventura County Bd. of Supervisors* (2018) 20 Cal.App.5th 572–576 [applicant for conditional use permit bore burden of demonstrating entitlement to the permit]; *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1224 [same].) Accordingly, the absence of evidence *supports*, rather than undermines, the City's decision. If plaintiffs believe that building a residence on the property requires an identifiable amount of grading, it is their burden to make that showing—not the City's burden to demonstrate to the contrary.

3. Plaintiffs Have Failed to Demonstrate that the Zoning Administrator's Findings Were Unsupported by the Evidence

Plaintiffs contend that the City's denial of their grading request is unsupported by the evidence. But plaintiffs ignore most of the zoning administrator's extensive findings, and

19

instead offer just three examples of the purported gap between the evidence and the decision.  None is persuasive.

First, plaintiffs suggest a fatal inconsistency between the *evidence* that the project would replace a dead end on Innsdale Drive with a turnaround for Fire Department emergency equipment, and the zoning administrator's *conclusion* that the proposed project would not "enhance the built environment in the surrounding neighborhood and perform a function or provide a service that is essential or beneficial to the community."  We do not agree.  The evidence that some of the project's features benefitted the community did not require the conclusion that the project, taken as a whole, was beneficial.  Nor does the fact that some of the City's findings favor plaintiffs suggest, as plaintiffs do, that the zoning administrator's findings were incompatible with the denial.

Second, plaintiffs suggest that the denial "reflected a misconception that all grading in excess of 3,300 cubic yard[s] related to the tennis court and associated improvements on and leading to the Fill Area."  Not so.  The zoning administrator stated—on the very same pages to which plaintiffs direct our attention—that extensive grading would be needed to create a driveway from the house to a proposed tennis court, *as well as* to accommodate a 20-foot driveway from the property line to the house and to "balance all of the graded material on the site."

Finally, plaintiffs suggest that the zoning administrator's rejection of "balanced grading" (placing the fill on-site) was unsupported by the evidence because "there was no evidence to support a finding that a haul route with thousands of truck trips running up and down substandard residential streets for months with dust, noise and vehicle pollution . . . would be preferable to

20

balanced grading." This assertion misapprehends the burden of proof. As the applicants, it was plaintiffs' burden to demonstrate that balanced grading was superior to removing the "cut" from the project site—*not* the City's burden to demonstrate to the contrary. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 521.) Plaintiffs' unsupported assertions that removing the excavated earth from the property would "create[e] much greater environmental impacts" than leaving it on-site does not satisfy that burden. The absence of any evidence on this issue supports, rather than undermines, the denial of plaintiffs' application.

## II.

### Motion for Judgment on the Pleadings

*A.    Standard of Review*

" ' "A judgment on the pleadings in favor of the defendant is appropriate when the complaint fails to allege facts sufficient to state a cause of action. [Citation.] A motion for judgment on the pleadings is equivalent to a demurrer and is governed by the same de novo standard of review." [Citation.]' " (*Travelers Property Casualty Company of America v. Engel Insulation, Inc.* (2018) 29 Cal.App.5th 830, 834.)

"Under the governing legal principles, 'we take as true the well-pleaded factual allegations of the complaint.' (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 193.) We construe the 'complaint liberally to attain substantial justice among the parties.' (*Long Beach Equities, Inc. v. County of Ventura* [(1991)] 231 Cal.App.3d [1016,] 1024.) Nevertheless, we 'may not consider conclusions of fact or law, opinions, speculation or allegations which are contrary either to law or to judicially noticed facts.' (*Ibid.*) We

21

thus disregard any allegations of [a] complaint that conflict with judicially noticed documents as well as those that represent bare legal conclusions." (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 289; accord *Bockrath v. Aldrich Chemical Co., Inc.* (1999) 21 Cal.4th 71, 83 ["a complaint's allegations may be disregarded when they conflict with judicially noticed discovery responses"].)

B.  *Governing Law*

The second and third causes of action (for inverse condemnation and violation of civil rights) both are premised on an alleged regulatory taking.  A regulatory taking occurs when government regulation of private property is so onerous that it is "tantamount to a direct appropriation or ouster." (*Lingle v. Chevron USA Inc.* (2005) 544 U.S. 528, 537.)  "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617–618.)

The United States Supreme Court considered the ripeness element of a regulatory takings claim in *MacDonald, Sommer & Frates v. Yolo County* (1986) 477 U.S. 340 (*MacDonald*).  In *MacDonald*, the plaintiffs submitted a tentative subdivision map to the county planning commission, seeking to subdivide a piece of property into 159 single- and multi-family residential lots.  The planning commission rejected the subdivision plan, and the Board of Supervisors affirmed the determination, concluding that

22

the tentative subdivision map was neither " 'consistent with the General Plan of the County of Yolo, nor with the specific plan of the County of Yolo embodied in the Zoning Regulations for the County.' " (*Id*. at p. 342.) The plaintiffs filed a petition for writ of mandate and a complaint for declaratory and monetary relief; the complaint alleged that the county " 'restrict[ed] the Property to an open-space agricultural use by denying all permit applications, subdivision maps, and other requests to implement any other use,' " thereby appropriating the " 'entire economic use' " of the plaintiffs' property " 'for the sole purpose of [providing] . . . a public, open-space buffer,' " and that any further application would be futile. (*Id*. at p. 344.)

The County demurred, asserting that the complaint failed to plead facts amounting to a regulatory taking. (*MacDonald*, *supra* 477 U.S. at p. 345.) The superior court sustained the demurrer, and the Court of Appeal affirmed. (*Id*. at pp. 345–347.) The California Supreme Court denied review. (*Id*. at p. 348.)

After briefing and oral argument, the United States Supreme Court concluded that it was without jurisdiction to address the merits of the plaintiffs' regulatory takings claim. (*MacDonald*, *supra*, 477 U.S. at p. 348.) It explained that to establish a regulatory taking, an appellant must show that a regulation "has in substance 'taken' his property—that is, that the regulation 'goes too far.' " (*Ibid*.) Thus, "[u]ntil a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property,' 'it is impossible to tell whether the land [retains] any reasonable beneficial use or whether [existing] expectation interests [have] been destroyed.' " (*Id*. at p. 349.) Similarly "a court cannot determine whether a municipality has failed to provide 'just

23

compensation' until it knows what, if any, compensation the responsible administrative body intends to provide." (*Id.* at p. 350.)  In short, the court said, its cases "uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." (*Id.* at p. 351.)

In the case before it, the plaintiffs had "submitted one subdivision proposal" and "ha[d] yet to receive the Board's 'final, definitive position regarding how it will apply the regulations at issue to the particular land in question.' " (*MacDonald, supra,* 477 U.S. at p. 351.)  As a result, the plaintiffs had been denied only "only one intense type of residential development." (*Id.* at pp. 351–352 & fn. 8.)  Because the possibility existed "that some development [would] be permitted" on the plaintiffs' property, plaintiffs could not establish a regulatory taking.  (*Id.* at pp. 352–353.)

Applying *MacDonald*, California courts have held that property owners " 'bear[] a heavy burden of showing that a regulation as applied to a particular parcel is ripe for a taking claim.' [Citation.]  The property owner can show that a final decision has been made for ripeness purposes only when it can set forth facts that are ' "clear, complete, and unambiguous showing that the agency has "drawn the line, clearly and emphatically, as to the *sole use* to which [the property] may ever be put." ' " (*County of Alameda v. Superior Court* (2005) 133 Cal.App.4th 558, 567; see also *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1032 [same].)  Stated differently, "[i]f the governmental agency has not decisively acted to ban all development of the parcel, an owner's ability to use his or her property cannot be said with assurance to

24

have been irretrievably lost.  Similarly, until the agency acts with finality, it will not be known whether the development of multiple contiguous but differently zoned parcels will be treated together or separately by the agency." (*Twain Harte Associates, Ltd. v. County of Tuolumne* (1990) 217 Cal.App.3d 71, 89; see also *Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238, 256 ["A takings claim that challenges the application of regulations to particular property is not ripe until 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.' "]; *Long Beach Equities, Inc. v. County of Ventura* (1991) 231 Cal.App.3d 1016, 1040 [applying ripeness analysis to due process and equal protection claims based on alleged regulatory taking].)

C.     *The Trial Court Properly Granted the City's Motion for Judgment on the Pleadings Because Plaintiffs' Claims Are Not Ripe*

Having independently reviewed the City's findings, of which plaintiffs sought judicial notice, we conclude that the City has neither rendered a final decision nor precluded all development of the property.  Instead, the City granted plaintiffs permission to build a single-family home, accessory buildings, and retaining walls; and while it denied plaintiffs' request "to permit a maximum of 79,700 cubic yards of cut and fill grading," it neither definitively limited plaintiffs to 3,300 cubic yards of fill nor precluded plaintiffs from submitting another, more modest, development proposal.

At the hearing before the APC, plaintiffs made the same argument they make here, asserting that the zoning administrator's findings prevented them from building a home of

25

any size on the property. The APC addressed this issue with the zoning administrator, asking whether "if we deny the appeal, then, can't they come back with a different plan?" The zoning administrator said that plaintiffs *could* come back with a different plan. He also made clear that his findings were not a final determination limiting plaintiffs to 3,300 cubic yards, but rather were a rejection of the only plan before him: "[A]s I said before, all I had before me was 79,000 cubic yards. I did not have any alternatives to that particular project. So it was either 'yea' or 'nay' on that particular issue." Accordingly, the City's determination cannot properly be characterized as " 'a *final decision* regarding the application of the zoning ordinance . . . to [plaintiffs'] property' " (*MacDonald*, *supra*, 477 U.S. at p. 349, italics added), and it therefore cannot form the basis for a regulatory takings claim.

Similarly, plaintiffs' due process and equal protection claims are also not ripe, because the contention that the BHO is being improperly, inconsistently, or discriminatorily applied, cannot be evaluated until it is known how the City will apply them to appellants' property. Only a final determination by the responsible agency enables a reviewing court to determine the constitutional questions plaintiffs purport to raise in this action. (*Long Beach Equities, Inc. v. County of Ventura*, *supra*, 231 Cal.App.3d at pp. 1040–1041; *Kinzli v. City of Santa Cruz* (9th Cir. 1987) 818 F.2d 1449, 1455–1456.)

Plaintiffs assert on appeal, as they did in the trial court, that a determination of this kind cannot properly be made on a motion for judgment on the pleadings because "it is not for the trial court to argue with the facts alleged in the complaint." But as we have said, although on a motion for judgment on the

pleadings we generally take as true the well-pleaded factual allegations of the complaint, we may not accept as true any allegations "that conflict with judicially noticed documents." (*McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253, 289.) In the present case, the trial court took judicial notice of the zoning administrator's findings. Plaintiffs do not suggest the trial court lacked discretion to do so—nor, indeed, could plaintiffs do so, as the trial court took judicial notice at plaintiffs' request. As such, it is within our purview to reject the complaint's characterizations of the City's findings that conflict with the findings themselves. In short, because our independent review of the City's findings reveals that the City has not made a final determination denying plaintiffs the right to build a house on their property, we need not accept as true plaintiffs' allegations to the contrary.[8]

---

[8] The cases that plaintiffs cite for the proposition that a landowner need not resubmit an application if it would be futile to do so are factually distinguishable and, therefore, not persuasive. In *Palazzolo v. Rhode Island* (2001) 533 U.S. 606, the Supreme Court said the landowner's takings claim was valid based on futility where the landowners had submitted at least *five development proposals* over the course of nearly 20 years, each of which was rejected. (*Id.* at p. 619.) In *Twain Harte Associates, Ltd. v. County of Tuolumne*, *supra*, 217 Cal.App.3d at p. 91, the court found a triable issue as to futility where "the County, on its own initiative, acted peremptorily to rezone" appellant's 8.7 acre parcel from light commercial to open space specifically in response to appellant's application to split the lot into three parcels. In the present case, in contrast, plaintiffs have submitted just one development proposal, and nothing suggests that the City has adopted zoning regulations to foreclose plaintiffs' development of the property.

27

For the same reason, we reject plaintiffs' suggestion that the trial court abused its discretion by not allowing leave to amend the complaint. We review the denial of leave to amend a complaint for an abuse of discretion. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865.) "If the court sustained the demurrer without leave to amend . . . we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.)

Plaintiffs contend they could amend their complaint by "plead[ing] more facts that would support their claim that additional applications would have been futile" and that the City's actions "were arbitrary, capricious, and irrational." Plaintiffs have not articulated what those alleged facts are, which is, alone, a sufficient reason for us to find no abuse of discretion. (E.g., *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 962 ["It is the plaintiff's burden on appeal to show in what manner it would be possible to amend a complaint to change the legal effect of the pleading; we otherwise presume the pleading has stated its allegations as favorably as possible."]; *Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 902 [same].)[9] But there is another, more

_____

[9] Plaintiffs assert that they could have stated a claim had they been permitted to conduct discovery. Because plaintiffs do not contend the trial court abused its discretion by denying permission to conduct discovery, we do not reach this issue.

28

significant reason. As we have said, the City's determinations and findings, of which the trial court took judicial notice, demonstrate that the City has not made a final decision regarding the scope of development that it will permit on plaintiffs' property. Because a court will not accept as true allegations that conflict with judicially noticed documents, no amendment could overcome the defects we have identified in the current complaint. Accordingly, the trial court did not abuse its discretion by denying plaintiffs leave to amend.

## DISPOSITION

The judgment is affirmed. The City is awarded its appellate costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

DHANIDINA, J.

29

Filed 4/5/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KENNETH K. YORK et al., | B278254 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BS153326) |
| v. | |
| CITY OF LOS ANGELES et al., | ORDER MODIFIYING OPINION AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

THE COURT:

The opinion in the above referenced matter filed March 8, 2019, was not certified for publication in the Official Reports. For good cause shown it now appears that the opinion should be published in the Official Reports.

In addition, it is ordered that the opinion is modified as follows:

1.     On page 5, the first sentence is modified to read as follows: "The zoning administrator must also make the following additional findings required by section 12.24(X)(28)(b)(5)(ii):"

2.     On page 24, the second sentence of the first full paragraph is modified to read as follows: "As a result, the plaintiffs had been denied 'only one intense type of residential development.'"

3.     On page 27, footnote 8, the third sentence is modified to read as follows: "In *Twain Harte Associates, Ltd. v. County of Tuolumne, supra*, 217 Cal.App.3d at p. 91, the court found a triable issue as to futility where 'the County, on its own initiative, acted peremptorily to rezone' a portion of appellant's 8.5 acre parcel from light commercial to open space specifically in response to appellant's application to split the lot into three parcels."

There is no change in judgment.

_____

_____
EDMON, P. J.                    EGERTON, J.
        DHANIDINA,

31